Timuel BLACK, Obie Roberts, Fannie O'Bannon, Terrie Pope, Donnley R. Phillips, and Karem R. Neal, Plaintiffs,

v.

COOK COUNTY OFFICERS ELECTORAL BOARD; Stanley T. Kusper, Jr., Aurelia Pucinski and Ernesto Borges, individually and in their official capacities as members of the Cook County Officers Electoral Board, Chicago Board of Electoral Commissioners; Arnette Hubbard, Raymond Jagielski and Michael Hamblet; individually and in their official capacities as Members of the Chicago Board of Elections Commissioners, Defendants.

No. 90 C 5529.

United States District Court, N.D. Illinois, E.D.

Oct. 2, 1990.

Roosevelt Thomas, Nathaniel R. House, Jr., R. Eugene Pincham, Francis X. Speh, Robert E. Pincham, Jr., Chicago, Ill., for plaintiffs.

Burton S. Odelson, County Officers Electoral Bd., Michael Levinson, Chicago Bd. of Election Com'rs, Chicago, Ill., for defendants.

George N. Leighton, Chicago, Ill., for intervenors-defendants.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

### STATEMENT OF FACTS

Plaintiffs bring this action under 42 U.S.C. § 1983, seeking injunctive and declaratory relief. Plaintiffs are signatories to nominating petitions for candidates to the Harold Washington Party ("HWP"). Those candidates were disqualified from appearing on the ballot for county-wide elections to take place November 6, 1990. Finding that the HWP had failed to meet certain requirements of the Illinois Election Code, Ill.Rev.Stat. ch. 46, Judge Eugene L. Wachowski of the Circuit Court of Cook County issued the disqualification order on September 20, 1990. Plaintiffs allege that Judge Wachowski's order, and the statutes underlying it, violated their Constitutional rights under the First and Fourteenth Amendments.

Concurrently with this action, the HWP appealed Judge Wachowski's decision to the Illinois Appellate Court. To expedite review, the Supreme Court of Illinois agreed to hear the case directly. Oral arguments there are scheduled to take place on October 3, 1990. Now before the court are plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss. For the reasons stated below, the defendants' motion to dismiss is granted with prejudice.

### MOTION TO DISMISS

The intervening defendants, Dorothy Reed, Valerie A. Sutton, Patton L. Feichter, Ervin S. Ricks, and David Berrera, move to dismiss.[1] They present five grounds in support of their motion: abstention, the Anti–Injunction Act, res judicata, lack of subject matter jurisdiction, and failure to state a claim upon which relief can be granted. Although the first three grounds do not apply, the last two require dismissal of this action, as explained below.

■ (1) *Abstention.* Defendants urge the court to abstain pursuant to *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). But the *Younger* doctrine, which forbids a federal court from enjoining state court proceedings, has no bearing on this action. More relevant are the abstention doctrines expressed in *Pullman, Burford,* or *Colorado River,* but none of these cases require the court to abstain here for one principal reason: delay. Where, as here, "the dispute contains an urgent temporal concern defined by the upcoming ... election," abstention "would merely delay the ultimate resolution of the parties' dispute ..." *Mintz v. Barthelemy,* 722 F.Supp. 273, 280 (E.D.La.1989). *See also Badham v. U.S. Dist. Ct. for N.D. of Cal.,* 721 F.2d 1170, 1173 (9th Cir.1983) (no abstention in voting case, where the "dangers posed by an abstention order are particularly evident ... delay in such cases is particularly insidious ..."). Given the nature of plaintiffs' action, abstention would be inappropriate.

■ (2) *The Anti–Injunction Act.* According to defendants, the Anti–Injunction Act, 28 U.S.C. § 2283, compels the court to abstain. The Act prohibits federal courts

---

1. These defendants, who had successfully challenged plaintiffs' nominating petition before the Circuit Court, were granted leave to intervene at the start of these proceedings.

from "grant[ing] an injunction to stay proceedings in a State Court ..." That is not what plaintiffs have requested. Rather, they have brought a constitutional challenge to Illinois' election laws, and the Circuit Court's application of them. In any event, actions brought under 42 U.S.C. § 1983 are explicit exceptions to the Anti-Injunction Act. *Mitchum v. Foster,* 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972). The Act does not afford defendants relief.

■ (3) *Res Judicata.* Because plaintiffs were privy to the Circuit Court proceedings, say defendants, the doctrine of res judicata prevents them from bringing this suit. Res judicata precludes the exercise of federal jurisdiction as to any matters raised, or which could have been raised, before the state court. *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Migra v. Warren City School Dist. Bd. of Educ.,* 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). Plaintiffs here deny being in privity with the plaintiffs who appeared before Judge Wachowski.

Whether or not there is privity is of no consequence.[2] Judge Wachowski expressly declined to consider plaintiffs' constitutional challenges in his order of September 20, 1990 ("The constitutionality of § 10-2 of the Election Code need not be addressed"). Because the Circuit Court did not address the constitutional claims brought by their privies, plaintiffs cannot be barred by res judicata from bringing them here. *Cf. Migra v. Warren City, supra,* at 84, 104 S.Ct. at 897 ("In the present litigation, plaintiff does not claim that the state court would not have adjudicated her federal claims had she presented them in her original suit in state court.").

■ (4) *Lack of Subject Matter Jurisdiction.* It is well-established that lower federal courts have no jurisdiction to re-

view the final determinations of state judicial proceedings. *See, e.g., Worldwide Church of God v. McNair,* 805 F.2d 888, 890 (9th Cir.1986) (see cases cited). The Supreme Court recently revisited this principle in *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). In *Feldman,* the Court held that the district court lacked jurisdiction over much of the plaintiffs' challenge to a decision issued by the District of Columbia court. That court, which is equivalent to a state court, had denied the plaintiffs' petitions for waiver of certain requirements for admission to the D.C. bar. The Supreme Court explained:

> United States district courts ... have subject matter jurisdiction over general challenges to state bar rules, promulgated by state courts in nonjudicial proceedings, which do not require review of a final state-court judgment in a particular case. They do not have jurisdiction, however, over challenges to state-court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional. Review of those decisions may be had only in this Court.

*Feldman,* at 486, 103 S.Ct. at 1316.

Applying this principle to the facts before it, the Court found the district court had jurisdiction to decide the constitutionality of the District of Columbia's bar rule, because that task did not require review of "a state court judgment in a particular case." *Id.* The district court had no jurisdiction to review Feldman's constitutional challenge to the rule's application in his particular case, however. *Feldman,* 460 U.S. at 486–87, 103 S.Ct. at 1316–17. The Court fashioned the following rule for courts to follow in deciding whether jurisdiction may be exercised:

> If the constitutional claims presented to a United States district court are inextricably intertwined with the state

2. The court finds that privity clearly exists between the plaintiffs here and in the Circuit Court. Privity lies between "'parties who adequately represent the same legal interests.'" *Hartke v. Chicago Bd. of Election Commissioners,* 651 F.Supp. 86, 90 (N.D.Ill.1986) (citations omitted). Plaintiffs here are signatories to the petitions nominating candidates of the Harold Washington Party, who were the plaintiffs before Judge Wachowski. Their interests in this case are identical, as are the issues raised and the Election Code provisions involved.

court's denial in a judicial proceeding of a particular plaintiff's application for admission to the state bar, then the district court is in essence being called upon to review the state court decision.

*Id.,* at 482, n. 16, 103 S.Ct. at 1314–1315, n. 16. As a host of cases following *Feldman* illustrate, the doctrine enunciated there applies to all state court judgments, not only those having to do with bar admissions. Furthermore, the *Feldman* doctrine applies to state judgments even though state court appeals are not final. *Worldwide Church of God,* at 893, n. 3.

That plaintiffs here have, at least in part, sought direct review in this court of the Illinois Circuit Court's judgment can scarcely be denied. Their supporting memorandum is rife with language to that effect. See, for example, p. 9 ("the Court erred in its ruling that the nominating petitions of the HWP were defective for failure to include a slate of state officers ... the Circuit Court's ... decision is clearly erroneous."); p. 10 ("[b]oth the COEB and the Court were in error"); p. 13 ("[t]he imposition by the COEB and the Court that the HWP submit a total of 75,000 signatures ... is violative of Ill.Rev.Stat. ch. 46 ... the Equal Protection Clause, the First Amendment ..."); p. 14 (the Cook County Circuit Court's decision ... is constitutionally reprehensible ...").

Accepting plaintiffs' invitation to review the Circuit Court's decision would directly violate *Feldman's* injunction against becoming "inextricably intertwined" in a final state court judgment. The court need not, however, dismiss the entire case on this ground. Like the Supreme Court in *Feldman,* this court must "differentiate between federal district court review of a state court's specific determination (which is prohibited) and a general challenge in federal court to the constitutionality of a

state rule or procedure (which is permissible)." *Kramer v. Exchange National Bank and Hon. Sophia J. Hall,* 1988 WL 11401, 1988 U.S.Dist.Lexis 1087 (N.D.Ill. 1988), p. 6.

The case of *Worldwide Church of God, supra,* offers some useful guidance in applying the Supreme Court's "inextricably intertwined" standard. Claims are inextricably intertwined

if the district court must "scrutinize not only the challenged rule itself, but the [state court's] application of the rule ..." If, in order to resolve the claim, "the district court would have to go beyond mere review of the rule *as promulgated,* to an examination of the rule *as applied* by the state court to the particular factual circumstances of [the plaintiff's] case," then the court lacks jurisdiction.

*Worldwide Church of God,* at 892, *citing Razatos v. Colorado Supreme Court,* 746 F.2d 1429, 1433 (10th Cir.1984), *cert. den.,* 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985).

The foregoing principles afford plaintiffs a narrow window through which they may seek relief in this court. While not a model of clarity, their complaint and subsequent memoranda seem to challenge not only Judge Wachowski's application of Illinois' election laws, but also the constitutionality of the laws themselves. Insofar as plaintiffs dispute the Circuit Court's interpretation or application of the Illinois election code, this court lacks subject matter jurisdiction to entertain the challenge. To the extent that plaintiffs bring a constitutional challenge to the election code itself, the court may hear it. In that light, the court addresses plaintiffs' claims below.[3]

---

**3.** The Cook County Officers Electoral Board, Stanley T. Kusper, Jr., Aurelia Pucinski and Ernesto Borges have filed their own motion to dismiss. The gist of their motion is that the Electoral Board "has no authority to place the candidates back on the ballot." Motion, p. 4. Nevertheless, movants concede that "it is not unknown for an electoral board to submit itself to the jurisdiction of the court for purpose of

implementing orders relating to the preparation of ballots." Motion, n. 2. Given this fact, the court declines to dismiss the Board and its members from the case. Likewise, the court declines to dismiss on the technical ground that none of the named plaintiffs are suburban voters. It would delay these proceedings unnecessarily to do so, when plaintiffs could clearly furnish an appropriate individual plaintiff.

## CONSTITUTIONAL CLAIMS

In their complaint, plaintiffs raise two constitutional claims over which this court has jurisdiction. Plaintiffs first allege that the signature requirement for new political parties seeking to be placed on the ballot in county-wide elections in 46 Ill.Rev.Stat. § 10–2 (1989) ("§ 10–2") is unconstitutional. The second constitutional argument raised by the plaintiffs is that the requirement under § 10–2 that a new political party field a complete slate is unconstitutional, if a complete slate includes a full slate of judicial candidates.

■ (1) *Signature Requirement.* Section 10–2 allows a group of persons wishing to establish a new political party within a county to file a petition with the county clerk to obtain a place on the ballot at the next election. The HWP wished to obtain its place on the ballot by acquiring the requisite number of signatures. Because the HWP hoped to run candidates for the Cook County Board, which is composed of suburban and city commissioners, it had to meet the signature requirement of § 10–2 for each "component" of the county of which its ticket was comprised.

The signature requirement of § 10–2 for running a ticket of county officers reads:

> If such new political party shall be formed for any district or political subdivision less than the entire State, such petition shall be signed by qualified voters equaling in number not less than 5% of the number of voters who voted at the next preceding regular election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area.

The 5% signature requirement was found to be unconstitutional to the extent that it imposed on those wishing to enter local elections a more stringent signature requirement than it imposed on those entering state-wide elections. *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979). To remedy the constitutional problem, the signature requirement of § 10–2 was amended to read:

> [W]henever the minimum signature requirement for a district or political subdivision new political party petition shall exceed the minimum number of signatures for State-wide new political party petitions at the next preceding State-wide general election, such State-wide petition signature requirement shall be the minimum for such district or political subdivision.

The state-wide petition signature requirement is "1% of the number of voters who voted at the next preceding State-wide general election or 25,000 qualified voters, whichever is less."

Section 10–2 goes on to require that "such petition shall consist of separate components for each district from which an officer is to be elected." The County Officers Electoral Board ("Electoral Board") considered this to include three components in the case of the HWP: the city, suburbs, and the Metropolitan Water Reclamation District ("MWRD"). Judge Wachowski of the Circuit Court of Cook County, on the other hand, determined the MWRD to be a separate political subdivision and not a component of Cook County. Therefore, Judge Wachowski found that under § 10–2, the HWP was required to gather 25,000 signatures from each of the city and the suburbs, totaling 50,000.

It is the requirement that the HWP gather 25,000 suburban signatures for the suburban component of its ballot to which the plaintiffs address their constitutional attack. Plaintiffs argue with regard to the suburban component that:

> The Board's and the Review Court's decisions that the Harold Washington Party nominating petitions for suburban members of the Cook County Board of Commissioners required 25,000 signatures were clearly invalid and unreasonable, in that there are only 25,000 signatures required from the entire county, i.e. Chicago and the suburbs, for the nominating of county officers of Sheriff, State's Attorney, Assessor, Treasurer, Clerk, President of the Board of County Commissioners, Superintendent of Education; and to likewise require an equal 25,000

signatures solely from the suburbs to nominate seven suburban Cook County Board members is irrational and unreasonable.

Complaint, p. 16.

On a number of occasions, the Supreme Court has addressed the issue of what hurdles a state may constitutionally impose on a new political party. The Court has acknowledged that any restrictions on access to the ballot "burden two distinct and fundamental rights, 'the right of individuals to associate for the advancement of political beliefs and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.'" *Socialist Workers*, 440 U.S. at 184, 99 S.Ct. at 990, citing *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). Because certain fundamental rights are at stake, a state must demonstrate that a compelling interest is served by the restrictions at issue. *Socialist Workers*, 440 U.S. at 184, 99 S.Ct. at 990; *American Party of Texas v. White*, 415 U.S. 767, 780–781, 94 S.Ct. 1296, 1305–1306, 39 L.Ed.2d 744 (1974).

In general, the courts have upheld state laws regulating elections if "the state's justification is logically sound and consonant with common experience." *Citizens for J.W. Moore v. Chicago Election Commissioners*, 665 F.Supp. 1334, 1339 (N.D. Ill.1987). Thus, the Supreme Court has found that a state's interest in keeping its ballots within manageable, comprehensible limits is a legitimate interest, *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); as is a state's interest "in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception and even frustration of the democratic process at the general election." *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971). In *Lubin v. Panish*, 415 U.S. 709, 715, 94 S.Ct. 1315, 1319, 39 L.Ed.2d 702 (1974), the Court observed:

A procedure inviting or permitting every citizen to present himself to the voters on the ballot without some means of measuring the seriousness of the candidate's desire and motivation would make rational voter choices more difficult because of the size of the ballot and hence would tend to impede the electoral process.

A state may regulate to ensure an efficient electoral process, but it must do so in the least drastic way. *Id.* at 716, 94 S.Ct. at 1320.

Plaintiffs argue that the requirement in § 10–2 that the same number of signatures be collected for the city and the suburban component of the HWP petition is irrational and unreasonable. In support of their contention, plaintiffs rely on *Socialist Workers*, 440 U.S. 173, 99 S.Ct. at 983, a Supreme Court case that found a geographical disparity in the signature requirements under the Illinois election laws to be unconstitutional. *Socialist Workers* was one of a series of challenges brought against the Illinois election code, on the grounds that its geographical apportionment requirements were unconstitutional.

The first such challenge, brought in *Moore v. Ogilvie*, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), led the Supreme Court to strike down an Illinois requirement that petitions nominating candidates to new political parties be signed by at least 25,000 qualified voters, including 200 qualified voters from each of at least 50 counties. The Court held that this provision violated the due process and equal protection clauses of the Fourteenth Amendment, because 49 of the counties in Illinois contained 93.4% of the registered voters, while the remaining 6.6% of registered voters came from the remaining 53 counties. This concentration of registered voters in fewer than 50 of the counties meant a situation could arise in which 93.4% of the registered voters would be unable to form a new political party, while 6.6% of the registered voters could form a party. In this way, the strength of the majority of Illinois voters was diluted in an unconstitutional manner.

After the Illinois statute was amended to comply with *Moore*, the Supreme Court was again faced with questions concerning

the constitutionality of the signature requirements. *Socialist Worker's*, 440 U.S. 173, 99 S.Ct. 983. In *Socialist Worker's*, the Court struck down a signature requirement that conceptually parallels that faced by the HWP. Under the Illinois election law as it stood at the time the *Socialist Worker's* suit was brought, a new political party interested in entering local elections had to collect more signatures to get on the ballot than did a candidate for a state-wide election. The state could offer no reason for the disparity other than the fact that state-wide candidates had been subject to a geographic requirement as well, until the Seventh Circuit struck that down in *Communist Party of Illinois v. State Board of Elections*, 518 F.2d 517 (7th Cir.), *cert. denied*, 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975). This disparity was, in other words, the result of an "historical accident," which, the Supreme Court held, did not constitute sufficient reason to sustain the provision. 440 U.S. at 187, 99 S.Ct. at 991.

*Socialist Worker's* does not suggest that equivalent requirements may not be imposed on differently sized geographic areas. Thus, as a consequence of the *Socialist Worker's* decision, § 10–2 was amended to include the provision ensuring that the minimum signature requirement for a district or a political subdivision would never exceed that for State-wide office. Moreover, the Seventh Circuit has cautioned against drawing broad generalizations from the language of *Socialist Worker's*:

> The plaintiffs apparently take the position that the *Socialist Worker's Party* case stands for the broad proposition that a state may never impose a higher signature requirement for an office of a smaller subdivision than the requirement imposed for any office of a larger subdivision. We cannot agree.

*Citizens Party v. Illinois State Board of Elections*, 546 F.Supp. 1050, 1057 (D.C.Ill. 1982); *Bowe v. Board of Election Commissioners of the City of Chicago*, 614 F.2d 1147, 1151 (7th Cir.1980).

In the last election for Cook County Board Commissioners, 1,476,370 voters cast their ballots. Of those, 841,085 were cast in the City of Chicago, and 635,285 were cast in the district outside the city. Nothing in either *Moore* or *Socialist Worker's* counsels this court to find a signature requirement of the lesser of 25,000 or 5% unconstitutional. The disparity created by the parallel requirements for the suburban and city components of the petition under § 10–2 does not create anything like the disparity at issue in *Moore*. In fact, the breakdown between the city and the suburban components was 57% and 43% respectively in 1986 and is much closer today. As the Electoral Board found in its decision of August 29, 1990, "[t]he fact that 44,000 signatures were collected in Chicago, which has only slightly more voters than suburban Cook, supports the Board's position that the 25,000 suburban requirement would be attainable if the HWP had a modicum of support in that jurisdiction." (Decision of the Electoral Board, p. 13).

Furthermore, because the Board of Cook County Commissioners is composed of representatives from the city and the suburban district, the requirement that petitions be fielded from both districts is not the result of "historical accident" as in *Socialist Worker's Party*. Instead it is an efficient means of ensuring that candidates for the Cook County Board have the support of their constituents.

If the signature requirement were compounded by other unduly burdensome requirements, this court would find the signature requirement more constitutionally troubling. For example, in *Williams*, 393 U.S. at 24–25, 89 S.Ct. at 7–8, the Supreme Court struck down a requirement that a new political party "obtain petitions signed by qualified electors totaling 15% of the number of ballots cast in the last gubernatorial election," when, in addition, that party was subject to other burdensome procedural and organizational requirements, including the requirement that a new political party run a primary election.

In *Jeness*, 403 U.S. 431, 91 S.Ct. 1970, the Supreme Court upheld a 5% signature requirement, in the face of claims that established parties were advantaged by the fact

that they did not face the same requirements. The Court rejected that argument, because members of established parties faced comparable burdens, such as holding primary elections. The same differentiation applies in Illinois, in which candidates from new political parties must comply with stringent signature requirements, whereas candidates from established political parties must submit to primaries. *Jeness*, like *Williams*, illustrates the fact that signature requirements, without more, are not inherently burdensome.

In fact, the Supreme Court has held that "[d]emanding signatures equal in number to 3% or 5% of the vote in the last election is not invalid on its face." *American Party of Texas v. White*, 415 U.S. 767, 789, 94 S.Ct. 1296, 1310, 39 L.Ed.2d 744 (1974). In light of the above, it cannot be said that a signature requirement of the lesser of 25,-000 or 5% signature is unconstitutional.

■ (2) *Complete Slate Requirement.* We turn next to plaintiffs' second constitutional argument. Plaintiffs contend that it is unconstitutional to require a new political party to field a complete slate of judicial candidates along with a complete county slate. The argument involves the interpretation of an element of § 10-2 which requires the petition filed by a new political party to "contain a complete list of candidates of such party for all offices to be filled in the ... political subdivision."

Judge Wachowski found that a complete slate included judicial candidates, and he, therefore, disqualified the HWP, in part, because of its failure to file any candidates for judicial office in Cook County. The Election Code does not expressly require a full slate of judicial candidates in order for a party to meet the complete slate requirement. As the Electoral Board noted, judicial offices are state, rather than county offices. (Decision of the Electoral Board, p. 21). Moreover, judges are elected from separate judicial districts rather than by county, as county-wide officers are elected. It happens that in three counties, including Cook, the county subdivision and the judicial district are coextensive. This is generally not the case, however. For this reason

it seems illogical and contrary to the language and intent of the Illinois General Assembly to interpret the complete slate provision to include state judicial candidates in county-wide elections.

The only court which has interpreted the complete slate requirement of the Illinois election code is the Illinois Supreme Court in *Anderson v. Schneider*, 67 Ill.2d 165, 8 Ill.Dec. 514, 365 N.E.2d 900 (1977). In that case, the Illinois Supreme Court refused to knock the entire slate of a new political party off the ballot merely because one candidate did not meet the residency requirement. The court determined that § 10-2 does not serve as an onerous procedural requirement, but rather, it aims "to obviate the possibility that a candidate might also run as an independent or as the candidate for some other party, a practice forbidden by Section 10-7 of the Code." This interpretation of the complete slate requirement as an attempt to prevent a candidate from taking two bites at the same apple underscores the idea that a full judicial slate does not fall within its terms.

In this court's view, judges are not part of the complete slate requirement set forth in § 10-2. As such, the court finds nothing unconstitutional in the requirement that the petition filed by a new political party must contain "a complete list of candidates of such party for all offices to be filled in the ... political subdivision." By ensuring that candidates run only once, on the ticket on which they are slated, the state's interest in an efficient electoral purpose is served.

To the extent that the plaintiffs would have this court review Judge Wachowski's interpretation of § 10-2 concerning the judicial slate requirement, this court does not have jurisdiction to do so. Under the *Feldman* doctrine, as noted above, a federal district court cannot review the final decision of a state court judge.

(3) *Conclusion.* For the foregoing reasons the court holds that the signature requirement is not unconstitutional as it applies to the separate components which comprise Cook County. The court further finds that the complete slate requirement is

not unconstitutional insofar as it does not require a new political party to field a complete slate of judicial candidates. Plaintiffs have failed to state a claim upon which relief can be granted. Accordingly, defendant's motion to dismiss is granted with prejudice. This shall constitute a final appealable order.